IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SALVADOR JOSEPH GONZALES,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:10-cr-00967 CW<br><br>Judge Clark Waddoups |

Salvador Joseph Gonzales ("Gonzales") was indicted on October 20, 2010 under 26 U.S.C. § 5861(d), for possession of an unregistered short-barreled rifle. Defendant moved to have the indictment dismissed on the grounds that section 5861(d), as it pertains to .22 caliber short-barreled rifles, is unconstitutional under the Second Amendment. The court holds that Defendant's .22 caliber short-barreled rifle is not a weapon protected by the Second Amendment, for the reasons set forth below. Furthermore, even if the Second Amendment protected the firearm, the legislation survives review under intermediate scrutiny.

## BACKGROUND

On September 17, 2010, police arrived at the home Gonzales shared with his wife, in response to a 911 call reporting a domestic altercation. They arrested Gonzales and seized an

unloaded, sawed-off .22 caliber rifle from inside the home. The gun's barrel was under twelve inches in length, and the weapon had an overall length of approximately 20 inches. The rifle was not registered to Gonzales in the National Firearms Registration and Transfer Record. The government indicates that a few weeks after his arrest, during a post-Miranda interview, Gonzales admitted to owning the short-barreled rifle for some time, stating that he cut the barrel short and modified the stock himself years earlier.

26 U.S.C. § 5861(d) makes it unlawful for an individual "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." With respect to this provision, "firearm" is defined as a short-barreled shotgun, a machine gun, a silencer, a destructive device, or any "rifle having a barrel or barrels of less than 16 inches in length [or] a weapon made from a rifle if such weapon, as modified, has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a). Before making a short-barreled rifle, a person is required to obtain the permission of the Secretary of the Treasury to make and register the firearm, 26 U.S.C. § 5822, and must pay a $200 tax, 26 U.S.C. § 5821(a). Each transfer of a short-barreled rifle is also taxed at $200. 26 U.S.C. § 5811. Violation of any of these provisions may lead to penalties including seizure of the unregistered firearms, 26 U.S.C. § 5872(a), as well as fines of up to $10,000 and up to ten years imprisonment, 26 U.S.C. § 5871.

Gonzales is challenging his indictment, arguing that the requirement that short-barreled rifles be registered infringes upon his Second Amendment rights. Specifically, Gonzales argues that there is no functional difference between a .22 caliber short-barreled rifle and a .22 caliber

handgun, and that handguns have been recognized as protected by the Second Amendment by the Supreme Court in *District of Columbia v. Heller*, 545 U.S. 570 (2008). The court finds that, regardless of functional similarities, there are important cultural differences between handguns and short-barreled rifles which preclude Second Amendment protection and justify the registration requirement. Furthermore, as 26 U.S.C. § 5861 only mandates registration for short-barreled rifles, and does not fully prohibit their possession and use, it would survive intermediate scrutiny if the Second Amendment were to apply.

## ANALYSIS

### I. LEGAL STANDARD

"[P]retrial dismissal of an indictment is a rare exception, appropriate only in rare circumstances, where the Court is able to make a determination that, *as a matter of law*, the government is incapable of proving its case beyond a reasonable doubt." *United States v. Engstrum*, 609 F. Supp. 2d 1227, 1229 (D. Utah 2009) (emphasis in original) (internal citations, quotations, and alterations omitted). All allegations made in the indictment must be taken as true. *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006).

### II. THE SAWED-OFF RIFLE IS NOT PROTECTED BY THE SECOND AMENDMENT

The Tenth Circuit has established a two-pronged approach when considering statutory challenges under the Second Amendment. "A reviewing court first asks whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If it does not, the court's inquiry is complete. If it does, the court must evaluate the law under some form of means-end scrutiny." *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir.

2010) (internal quotations, citations, and alterations omitted).  Therefore, the court must first determine whether possession of a short-barreled rifle is conduct protected by the Second Amendment.

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In *Heller*, the Supreme Court clarified that this constitutional provision guarantees "the individual right to possess and carry weapons in case of confrontation," even to those individuals who do not participate in a state-recognized militia.  554 U.S. at 592. However, "[l]ike most rights, the right secured by the Second Amendment is not unlimited [and] is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.* at 626.

Decades before *Heller*, the Supreme Court determined, in *United States v. Miller*, 307 U.S. 174 (1939), that the federal government could require registration and taxation of short-barreled shotguns without violating the Second Amendment.  In *Heller*, the Court explained *Miller* establishes "that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."  *Heller*, 505 U.S. at 625; *see also id.* at 627 (stating there is a long-standing "historical tradition of prohibiting the carrying of dangerous and unusual weapons").  In addition to short-barreled shotguns, circuit courts have held that other weapons, such as pipe bombs, *United States v. Tagg*, 572 F.3d 1320 (11th Cir. 2009), and machine guns, *Hamblen v. United States*, 591 F.3d 471 (6th

Cir. 2009), are not typically possessed by law-abiding citizens for lawful purposes, and thus fall outside the scope of the Second Amendment.

*Heller* also explained that the Second Amendment does not invalidate "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27. The concept that longstanding regulations are presumptively valid has been recognized in other cases by the Supreme Court. *See Nev. Comm'n on Ethics v. Carrigan*, 131 S. Ct. 2343, 2347–48 (2011) ("A universal and long-established tradition of prohibiting certain conduct creates a strong presumption that the prohibition is constitutional: Principles of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness. Laws punishing libel and obscenity are not thought to violate 'the freedom of speech' to which the First Amendment refers because such laws existed in 1791 and have been in place ever since) (internal quotations, citations, and alterations omitted); *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3047 (2010). Most recently, the District of Columbia Court of Appeals has stated that, because "a regulation that is longstanding . . . necessarily . . . has long been accepted by the public, [and] is not likely to burden a constitutional right," a person challenging a longstanding gun regulation must rebut the presumption of lawfulness "by showing the regulation does have more than a de minimis effect upon his [Second Amendment] right." *Heller v. District of Columbia* ("*Heller II*"), No. 10-7036, 2011 WL 4551558, at *6 (D. C. Cir. Oct. 4, 2011). The court finds this reasoning persuasive.

26 U.S.C. § 5861(d) embodies a long-standing requirement that short-barreled rifles be federally registered and taxed. Short-barreled rifles, as well as short-barreled shotguns and machine guns, have been federally regulated and taxed since 1934, when Congress enacted the original National Firearms Act ("the 1934 Act").[1] The inclusion of short-barreled rifles under the definition of "firearms" that are taxed and registered, as well as the related legislative history, manifests a determination by Congress that such weapons were not typically possessed by law-abiding citizens. This is important, as "[w]henever called upon to judge the constitutionality of an Act of Congress—the gravest and most delicate duty that [courts are] called upon to perform—[courts should accord] great weight to the decisions of Congress." *Rostker v. Goldberg*, 453 U.S. 57, 64 (1981).[2]

---

[1] The law imposed a tax of $200 upon each firearm transfer, National Firearms Act, § 3(a), Pub. L. No. 73-474, 48 Stat. 1236–40 (1934), and required all current firearm owners to register their firearms within 60 days of the effective date of the act. *Id.* at § 5(a). "Firearm" was defined as any "shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, [or] a muffler or silencer." *Id.* at § 1(a).

The relevant bill was originally numbered H.R. 9066, but was amended and renumbered H.R. 9741 before being enacted into law.

[2] This is especially so when Congress specifically considers the constitutionality of the legislation before passing it. *Rokster*, 453 U.S. at 64. With respect to the National Firearms Act, Congress did engage in such a discussion, not only on the constitutionality of using the taxing power to curtail criminal behavior, but also in the context of the Second Amendment. *See National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways and Means*, 73d Cong. 53 (1934) (hereinafter "Nat'l Firearms Act Hearings") (conversation between Del. Clement C. Dickinson, Member, H. Comm. on Ways & Means, Del. John W. McCormack, Member, H. Comm. on Ways & Means, and Karl T. Frederick, President, National Rifle Association of America) ("Mr. Dickinson. I will ask you whether or not this bill interferes in any way with the right of a person to keep and bear arms or his right to be secure in his person against unreasonable search; in other words, do you believe this bill is unconstitutional or that it violates any constitutional provision? Mr. Frederick. I have not given it any study . . . but I do

A.      **The 1934 Act**

During the Great Depression, the nation faced the difficulty of controlling violence by gangsters. *See* 78 Cong. Rec. 11,400 (1934) (statement of Rep. Robert L. Doughton) ("For some time this country has been at the mercy of the gangsters, racketeers, and professional criminals."); Nat'l Firearms Act Hearings, 73d Cong. 4 (1934) (Statement of Homer. S. Cummings, Att'y Gen. of the United States) ("[T]here are more people in the underworld today armed with deadly weapons, in fact, twice as many, as there are in the Army and the Navy of the United States combined"); *Lomont v. O'Neill*, 285 F.3d 9 (D.C. Cir. 2002) ("The emergence of organized crime as a major national problem led to the enactment of the National Firearms Act of 1934."). Congress responded with a collection of legislation, including the National Firearms Act, targeting "the roaming groups of predatory criminals who know . . . they are safer if they pass quickly across a state line." Nat'l Firearms Act Hearings, 73d Cong. 4 (1934) (Statement of Homer. S. Cummings, Att'y Gen. of the United States). In enacting the National Firearms Act, Congress "sought to regulate the sale, transfer, and license of machine guns, sawed-off shotguns, sawed-off rifles, and other firearms, other than pistols and revolvers, which may be concealed on the persons, and silencers." H.R. Rep. No. 75-2457, at 1 (1938).[3]

---

think it is a subject which deserves serious thought. Mr. Dickinson. My mind is running along the lines that it is constitutional. Mr. McCormack. You have been living with this legislation or following this type of legislation for quite a number of years. Mr. Frederick. Yes; I have. Mr. McCormack. The fact that you have not considered the constitutional aspect would be pretty powerful evidence, so far as I am concerned, that you did not think that question was involved.").

[3] While the court is cognizant of the need to be wary of ascribing a single purpose to any action undertaken by the legislature, the discussion surrounding the 1934 Act evinced a widely shared concern for preventing mobster violence. *See* 78 Cong. Rec. 11,400 (1934) (statement of Rep. William P. Connery, Jr.) ("As I understand, the primary purpose of the bill is to stop

The 1934 Act was originally drafted to include all pistols and revolvers, as well as short-barreled shotguns, short-barreled rifles, and machine guns. H. R. 9066, 73d Cong. (1934) ("[F]or the purposes of this act the term 'firearm' means a pistol, revolver, shotgun having a barrel less than sixteen inches in length, or any other firearm capable of being concealed on the person, a muffler or silencer therefor, or a machine gun."). In considering the Bill, the House Ways and Means Committee heard testimony from various groups, including gun manufacturers, the National Rifle Association ("NRA"), the American Legion, and the American Game Association. In addition, Congressional members received letters and telegrams from groups around the country, expressing various views about the proposed legislation. *See* 78 Cong. Rec. 11,398 (1934). Many of these comments, as well as much of the testimony, centered on legitimate uses for pistols and revolvers, and urged Congress not to require taxation and registration of such guns. Before passing the bill into law, Congress amended its language to include only short-

---

gangsters from getting hold of machine guns"); Nat'l Firearms Act Hearings, 73d Cong. 92 (1934) (Statement of Joseph B. Keenan, Assistant Att'y Gen.) ("Our position is this: The firearm today is causing a great deal of destruction and death in our land. . . . We do not believe this bill will disarm the hardened gangster, nor do we believe that it will prevent him from obtaining firearms. We do believe that it will permit effective and adequate prosecution, and take that man out of circulation when he does not comply.); *Id.* at 129 (Statement of J. Weston Allen, Chairman of the National Crime Comm'n) (observing "if we can have the right to register guns, so that a man who has unregistered guns is thereby guilty of a felony, you are going to put, in my opinion, more gunmen and gangsters in jail than by anything [else] that this committee can do"). *See also McKee & Co. v. First Nat. Bank of San Diego*, 265 F. Supp. 1 (C.D. Cal. 1967) ("When Congress passed the National Firearms Act [in June of 1934], imposing a tax on dealers in firearms and on the traffic of firearms, the purpose and intent of Congress was without question directed to the Dillingers, Ma Barkers, and gangsters who were plaguing the country with crimes of violence.") *United States v. Adams*, 11 F. Supp. 216, 218 (C.D. Fla. 1935) ("The National Firearms Act [arose from] a motive to prevent racketeers, bank robbers, and desperadoes from obtaining sawed-off shotguns and machine guns to run wild in crime and to enable the government to trace ownership.").

barreled shotguns, short-barreled rifles, machine guns, and silencers in the definition of "firearm."

This legislative history strongly suggests that handguns, as the Supreme Court in *Heller* observed, are "the quintessential self-defense weapon" and fall under Second Amendment protection. *Heller*, 554 U.S. at 629. In contrast, however, there was no discussion in the legislative history urging the exclusion of short-barreled rifles, supporting the conclusion that citizen-groups and members of Congress did not consider such weapons to have been typically used for lawful purposes. One representative specifically addressed the importance of rifles in deer hunting, but also expressed a belief that rifles with barrels shorter than 18 inches should be regulated. Nat'l Firearms Act Hearings, 73d Cong.13 (1934) (comment of Rep. Harold Knutsun, Member, H. Comm. on Ways & Means) (asking that the bill be amended to specifically ban short barreled rifles, stating he "would not like to pass any legislation to forbid or make it impossible for our people to keep arms that would permit them to hunt deer," but adding a barrel limit of 18 inches "would make this provision stronger than 16 inches").[4]

The legislative history not only supports that Congress concluded that short-barreled rifles were dangerous weapons not commonly used by law abiding citizens, but also indicates

---

[4] The only other discussion of barrel length in the 1934 Act's legislative history similarly supports the conclusion that guns short enough to fall under the Act were not lawfully used. Nat'l Firearms Act Hearings, 73d Cong. 81 (1934) (statement of Seth Gordon, President, Am. Game Ass'n) ("If you will permit one observation, there is some question about how far you ought to go when you say sawed-off shotgun. When you speak about a gun shorter than 18 inches or 20 or 22 inches, that is one thing. If you include a gun which happens to have the end of the barrel blown off because someone got snow or mud in it, and the barrels are cut off and they continue to use it, as they do in the country, it is another thing. You have to be careful when you say sawed-off shotgun so you do not include a gun which is still useful.").

that Congress considered the need to regulate .22 caliber rifles. At the behest of the NRA, the House Ways and Means committee considered exempting some .22 caliber pistols from the act, which it recognized as primarily being used for target practice. Such an exemption for .22 caliber short-barreled rifles was not proposed. Indeed, one Representative questioned whether a low-caliber rifle exemption would be appropriate, stating "[t]here are some high-powered .22 caliber rifles, not of a type for target practice." Nat'l Firearms Act Hearings, 73d Cong. 89 (1934) (comment of Rep. Roy O. Woodruff, Member, H. Comm. on Ways & Means).

**B.     The 1936 Amendment**

As time passed, Congress continued to assess the advisability of regulating .22 caliber short-barreled rifles. In 1936, it acted to amend the National Firearms Act. The amended language stated the definition of "firearm" did "not include any rifle which is within the foregoing provisions solely by reason of the length of its barrel if the caliber of such rifle is .22 or smaller *and* if its barrel is sixteen inches or more in length." Act of April 10, 1936, ch. 169, 49 Stat. 1192 ("1936 Amendment") (emphasis added). Therefore, although most rifles with barrels of less than eighteen inches were still regulated under the amended language of the act, an exemption was created for rifles of .22 caliber and less, so long as those rifles had barrels at least sixteen inches in length. All rifles with barrels shorter than sixteen inches continued to be regulated, regardless of caliber.

According to the legislative reports, the change was made because a few guns commonly used for lawful purposes had fallen under the sweep of the act.

> [U]nder a strict technical interpretation of [the original definition of 'firearm'], a discrimination and hardship, which was never intended, has been inflicted upon

> two or three manufacturers of .22 and less caliber hunting rifles . . . which are in fact less susceptible of being concealed on the person than other types of rifles, of the same caliber, not coming within the technical interpretation.

H.R. 2000, 74th Cong. (1936), incorporated fully in S. 1682, 74th Cong. (1936). Additionally, the Attorney General observed in support of the proposed amendment, "the Department [of Justice] has no desire to place unfair restrictions on the manufacturers of the ordinary small-caliber hunting or target rifles which are not employed by the criminal element." *Id.*

The 1936 Amendment confirms Congress specifically considered small-caliber rifles when mandating registration and taxation for weapons commonly used by criminals. Thus, the legislature has determined that rifles with barrels shorter than sixteen inches, including .22 caliber short-barreled rifles such as the one in this case, are not typically possessed for lawful purposes.

### C.     The Current Act

The National Firearms Act was amended several more times, before settling in its current form in 1968. National Firearms Act, Pub. L. No. 90-618, 1968 U.S.C.C.A.N. 4410 (codified at 26 U.S.C. §§ 5801–5872). The current language differs from the 1936 Amendment in that it removes the distinction between .22 caliber rifles and those of a greater caliber, and exempts all rifles with a barrel length longer than sixteen inches from the Act. 26 U.S.C. § 5845. In enacting this language, Congress specifically found that "short-barreled rifles are primarily weapons of war and have no appropriate sporting use or use for personal protection." S. Rep. No. 90-1501, at 28 (1968).

For nearly eighty years, the federal legislature has chosen to tax short-barreled rifles and require their registration, having determined that such weapons are not typically used for lawful purposes.[5] *See United States v. Thompson/Center Arms* Co., 504 U.S. 505, 517 (1992) ("It is of course clear from the face of the Act that the [National Firearms Act's] object was to regulate certain weapons likely to be used for criminal purposes, just as the regulation of short-barreled rifles, for example, addresses a concealable weapon likely to be so used."). This blanket prohibition was not made without careful consideration of the extent to which possession of .22 caliber short-barreled rifles should be regulated. Therefore, the court determines that Congress' longstanding regulation of these guns raises a presumption that short-barreled rifles, including .22 caliber rifles, are not constitutionally protected.

If Gonzales had made a showing that, despite Congress' longstanding determination, .22 caliber short-barreled rifles are commonly used by law-abiding citizens, the presumption might be rebutted and the Second Amendment may apply. Defendant, however, did not present any evidence on this point.[6] Instead, he focused on the functional similarities between .22 caliber handguns, which are fully protected under the core Second Amendment right, and .22 caliber short-barreled rifles. Although such guns may sometimes be almost identical in length and functionality, these technical similarities are not legally relevant so long as handguns remain

---

[5] The fact that Congress chose to tax such weapons, rather than prohibiting them completely, may suggest that there are some legitimate uses for short-barreled rifles. Even if this is true, however, it does not establish that short-barreled rifles are *commonly* used for lawful purposes.

[6] Typically the government bears the burden of proving the constitutionality of its statute. Given the presumptive validity of long-standing regulations, however, in this case the burden appropriately shifts to the challenger. *See Heller II*, 2011 WL 4551558, at *6.

commonly used for lawful purposes while short-barreled rifles are not typically possessed by law-abiding citizens. *See also United States v. Eggebrecht*, 486 F.2d 136, 137 (8th Cir. 1973) ("[T]he assertion that a sawed-off rifle 'become[s] just another handgun' not outlawed by the act [is not persuasive.]").

### III. EVEN UNDER THE SECOND AMENDMENT, SECTION 5861(d) WOULD SURVIVE INTERMEDIATE SCRUTINY

As explained above, the court finds that Gonzales' .22 caliber short-barreled rifle is not a weapon typically used by law-abiding citizens for lawful purposes, and thus falls outside the protections of the Second Amendment. Additionally, however, the court concludes that 26 U.S.C. § 5861(d) would be constitutional even if the firearm were protected by the Second Amendment.

When the Second Amendment is implicated, the second prong of the *Reese* test requires the court to review the challenged statute under some form of means-end scrutiny. *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010). In *Heller*, the Supreme Court did not specify what heightened level of scrutiny should be applied to laws infringing upon Second Amendment rights, beyond a comment that rational basis review is not appropriate. *Heller*, 554 U.S. at 628–29; *Reese*, 627 F.3d at 801. The Tenth Circuit, however, has directed that "'the Second Amendment can trigger more than one particular standard of scrutiny,' depending, at least in part, upon 'the type of law challenged and the type of Second Amendment restriction at issue.'" *Reese*, 627 F.3d at 801 (quoting *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010)) (internal alterations omitted).

Thus, when a law infringes upon Second Amendment rights, the court should apply either intermediate or strict scrutiny, depending upon how restrictive the law is. *Reese*, 627 F.3d at 802. Restrictiveness is gauged both by the class of persons affected by the law, as well as the class of firearms. *Id.* In other words, a regulation prohibiting the general public from acquiring any guns may be subject to strict scrutiny, while a statute prohibiting only some people, such as those convicted of domestic violence, from acquiring guns, or banning only possession of some guns, such as those with obliterated serial numbers, may be subject to intermediate scrutiny. *Id.*

26 U.S.C. § 5861(d) does apply to the public at large. At the same time, however, it applies only to a narrow class of firearms not commonly used lawfully, such as machine guns, sawed-off shotguns, and sawed-off rifles. The regulation does not prohibit the possession of handguns, "'the quintessential self-defense weapon[s]'" or "prevent a person from keeping a suitable and commonly used weapon for protection in the home or for hunting, whether a handgun or non-automatic long gun." *Heller II*, 2011 WL 4551558, at *14 (quoting *Heller*, 554 U.S. at 629).

Indeed, Section 5861 does not completely ban the possession of any type of gun. Instead, it provides that an individual acquiring possession of a "firearm" must first register the gun and pay a $200 tax. Thus, even were the court to conclude that the Second Amendment is implicated, the statute may be "characterized as a regulation of the manner in which persons may lawfully exercise their Second Amendment rights," much like a time, place, or manner restriction on First Amendment rights. *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010). Such restrictions, which do not "effectively disarm individuals or substantially affect their ability to

defend themselves" and "impose only modest burdens" on constitutional rights, are generally subject only to intermediate scrutiny. *Heller II*, 2011 WL 4551558, at *14. Because the National Firearms Act only regulates, and does not ban, the firearms at issue, it does not substantially burden constitutional rights. Therefore, intermediate scrutiny, not strict scrutiny, is the appropriate standard of review.[7]

In order for a statute to "pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." *Reese*, 627 F.3d at 802. In other words, the government must show a "fit" between its prohibition and its important interests. *Heller II*, 2011 WL 4551558, at *15.

In this case, the government has advanced several general interests, including public safety, crime prevention, and the need to keep firearms favored by criminals off the streets. These are all important objectives. *See Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434 (2002) ("[W]e find that reducing crime is a substantial government interest"); *United States v.*

---

[7] As Judge Stewart of the District of Utah recognized in *United States v. Engstrum*, 609 F. Supp. 2d 1227, 1231 (D. Utah 2009), the Second Amendment protects a fundamental right of the American people. *See also McDonald*, 130 S. Ct. at 3042 (observing the right to keep and bear arms has long been considered "among those fundamental rights necessary to our system of ordered liberty"). Judge Stewart applied strict scrutiny to the challenge under the Second Amendment before him in that case. Judge Stewart, however, did not have the benefit of the further development of the law in *Reese*. In *Reese*, the Tenth Circuit explained that, like the fundamental right to free speech, the right to bear arms is not universally protected by strict scrutiny. *See Reese*, 627 F.3d at 801. *See also Heller II*, 2011 WL 4551558, at *8 ("The [Supreme] Court has not said, however, and it does not logically follow, that strict scrutiny is called for whenever a fundamental right is at stake."); *Marzzarella*, 614 F.3d at 96 ("Strict scrutiny does not apply automatically any time an enumerated right is involved.").

*Griffin*, 7 F.3d 1512, 1517 (10th Cir. 1993) ("Important government interests include effective crime detection and prevention, and minimizing the risk of harm to officers and the public."); *United States v. Engstrum*, 609 F. Supp. 2d 1227, 1233 (D. Utah 2009) (finding the government has a compelling interest in "keeping firearms out of the hands of those . . . who pos[e] a prospective risk of violence to an intimate partner or child").

Once the government objectives have been identified as important, the court must "determine whether [the challenged statute] is substantially related" to these objectives. *Reese*, 627 F.3d at 803. The registration requirement regulates the availability of dangerous firearms, making the government aware of who owns short-barreled and sawed-off rifles. This regulation may impress upon individuals the potential dangerousness of such weapons. Nat'l Firearms Act Hearings, 73d Cong. 95 (1934) (statement of Joseph B. Keenan, Assistant Att'y Gen.). It also prohibits a person from sawing off a rifle, without authorization, to make it more concealable and potentially increases the penalties an armed criminal might face when registration requirements are violated. *Id.* at 92. Thus, the court concludes that prohibiting possession of an unregistered short-barreled rifle is substantially related to the governments' substantial interests in preventing crime and protecting the safety of the public. In the process, 26 U.S.C. § 5861 only imposes a minimal burden on those who wish to acquire a short-barreled rifle for lawful purposes. *See Heller II*, 2011 WL 4551558, at *7 ("[B]asic [gun] registration requirements are self-evidently de minimis, for they are similar to other common registration or licensing schemes, such as voting or for driving a car, that cannot reasonably be considered onerous."). Therefore, the statute survives intermediate scrutiny review.

## CONCLUSION

Based on the record before it and for the reasons stated above, the court finds that the .22 caliber short-barreled rifle the Defendant is charged with possessing is not a weapon typically used by law-abiding citizens for lawful purposes, and thus falls outside the protections of the Second Amendment. Additionally, however, the court concludes that even if Gonzales' firearm were within the scope of the Second Amendment, 26 U.S.C. § 5861(d) survives a constitutional challenge. Accordingly, Defendant's motion to dismiss the indictment is DENIED.

SO ORDERED this 2$^d$ day of November, 2011.

BY THE COURT:

_Clark Waddoups_
Clark Waddoups
United States District Judge